UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-20989-CR-RKA/JG(s)

UNITED STATES OF AMERICA

vs.

JOHNNY GROBMAN,
RAOUL DOEKHIE, and
SHERIDA NABI,

    Defendants.
_____/

### UNITED STATES' REPLY IN SUPPORT OF ITS AMENDED MOTION FOR PRELIMINARY ORDER OF FORFEITURE

The United States of America, by and through the undersigned Assistant United States Attorney, hereby files its reply in further support of its Amended Motion for Preliminary Order of Forfeiture [ECF No. 548] ("Motion"). Defendants' Opposition [ECF No. 549] misstates the record and applicable forfeiture law. Based on trial evidence, as supplemented by Mr. Ricupero's declarations and Defendants' own documents, the Court should enter the requested forfeiture money judgments against Grobman ($87,187,374.83), and Doekhie and Nabi ($115,699,273.61).

    A.    **The trial record and other evidence demonstrate Grobman sold fraudulently obtained products to distributors Quality King, Brothers Trading, Purity AP, Sultana, MQ Wholesale, and L&V Distributors, among others.**

In their Opposition, Defendants argue that the distributors identified by the Government were not part of the Defendants' fraudulent scheme and conspiracy, conceding that the cited distributors paid Grobman $87,187,374.83. Defendants premise their Opposition on a false characterization of the Government's position and the trial evidence, claiming that "[t]he government does not dispute that of the companies that the Ricupero affidavit identifies as sources of alleged proceeds [to Grobman], only Tannco ($15,127,488.88) was the subject of a count of

1

conviction." (Op. at 3.) In other words, they argue that the distributors were not part of the fraud conspiracy. The Government certainly disputes Defendants' assertion, which was raised for the first time at the August 26 hearing, making this reply the Government's first opportunity to respond in detail.[1] In their Opposition, Defendants ignore the significant evidence establishing that the cited distributors paid Grobman for fraudulently obtained products.

First, Trial Exhibits ("TEx.") 1A and 1AA were emails and worksheets in which Nabi asked Torres for false bills of lading for listed products, so the diverted products could be sold domestically and the companies would not discover Defendants' fraudulent scheme. (Jan. 28 Tr. at 1692:2-17, 1702:3-25; Jan. 29 Tr. at 1960:2-1962:13.) Certain "suppliers" selling to Tropical also were listed. (Jan. 28 Tr. at 1697:20-1698:6.) These worksheets did not contain all 50-60 companies that Torres testified were defrauded; for example, Mead Johnson, Eden, Domino, and Alcon do not appear, but all testified they were defrauded. (*See* Mot. at 4-6.) The jury credited the testimony of these witnesses, finding Defendants guilty on all counts.

Second, other evidence presented at trial further showed that, as part of the wire-fraud conspiracy, Grobman sold the products listed in Trial Exhibits 1A and 1AA to distributors identified by the Government in the Motion, including to L&V Distributors, Tannco, Brothers Trading, Sultana, and Quality King:

---

[1] During the hearing, the Court provided the following instructions to the Government regarding the amended forfeiture briefing: "I just want to reiterate, I don't want you to just come up with new arguments. I want you to consolidate the arguments you've made in those two filings [ECF Nos. 514 and 545] and put them into one amended motion." (8/26/21 Tr. at 80:20-23.) The Government followed the Court's instructions in crafting the amended motion, and now responds. Defendants ignore the Court's instruction by labeling their positions as undisputed. (Op. at 5, 6.)

- Grobman sold "For Export" Goya[2] coconut water to L&V Distributors (Frisone) (TExs. 1GM-H, 1GM-I; *see also* Jan. 30 Tr. at 2421:12-2422:11; Feb. 4 Tr. at 3050:15-18);

- Grobman invoiced both Tannco and Brothers Trading (via Victory Wholesale,[3] FEx. 3 (identifying Victory as a division of Brothers)) for Enfamil and Alcon products, among others (TEx. 1K (Invoices from J Trading and Nutrisource to Tannco and Victory (p.27)));

- Grobman sold "gray-market goods" to Sultana, and Sultana "kn[e]w the answer," whether Grobman was selling gray-market goods. (TEx. 1GM-AA); and

- Grobman sold fraudulently obtained Alcon products to Quality King. (TEx. 8D (Grobman sold "institutional" Alcon products to Quality King); Feb. 3 Tr. at 2621:2-2622:18).

Third, documents produced to Defendants in discovery further corroborate that payments to Grobman from the identified distributors were proceeds of the fraud conspiracy. These documents are attached to this reply as exhibits (referenced herein as "FEx."). *See* Fed. R. Crim. P. 32.2(B)(1)(b) (Court determines forfeiture based "on evidence already in the record, … *and* on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable.") (emphasis added); *United States v. Manlapaz*, 825 F. App'x 109, 115 (4th Cir. 2020) ("In calculating the forfeiture amount, the district court was entitled to consider any evidence in the record, as well as any additional evidence or information provided by the parties that the court found 'relevant and reliable.'"). The attached exhibits are relevant and reliable. They represent **Defendants' own documents**, from the same search warrant that Special Agent Simpson testified to during trial (*see* Jan. 30 Tr. at 2344:12-20), and were produced with "SWE" Bates

---

[2] Goya products are listed in Trial Exhibits 1A and 1AA. (*Accord* Jan. 28 Tr. at 1699:10-1700:16 (most Goya product not exported but released to J Trading); Jan. 29 Tr. at 1962:14-24; Feb. 4 Tr. at 3050:15-18 (Court stating "[t]here's plenty of evidence" Goya was defrauded).)

[3] Brothers Trading paid invoices sent to Victory Wholesale. For example, Trial Exhibit 1K has a 1/31/14 invoice with release number "J2623" in the amount of $389,065. (TEx. 1K at 27.) On or about February 11, 2014, J Trading Account 4800 received $485,795.14 from Brothers Trading, with the payment details identifying the payment as for "J2623," as well as another release. (FEx. 22.) Further establishing that Brothers Trading/Victory was part of the scheme—Mitch Tanne was the point of contact both for Tannco and Victory. (*See* TEx. 1K at 1, 27.)

numbers to the Defendants in discovery (ECF Nos. 63-65 (SDO responses identifying SWE documents).[4] They show that Brothers Trading (FEx. 3), Quality King (FEx. 4), Purity (FEx. 5), Sultana (FEx.6), and MQ Wholesale (FEx. 7) were distributors that purchased from Grobman the following fraudulently obtained products, the vast majority of which are identified in Trial Exhibits 1A and 1AA:

- Quality King purchased Kiwi, L'Eggs, Mead, Nature's Bounty, and air-freshener products, all of which (or their parent companies Hanes and ACCO[5]) are listed in Trial Exhibits 1A and 1AA;

- Brothers Trading purchased Kikkoman, Avery, and Goya products;

- Purity purchased Wonderful Nuts and Bertolli products (*See also* Jan. 28 Tr. at 1705:24-1706:3 (discussing Bertolli));

- Sultana purchased Armor All[6] products; and

- MQ Wholesale purchased STP products (*see* note 6).

---

[4] This is more than sufficient to meet the standard for consideration at sentencing as established in Fed. R. Crim. P. 32.2(B)(1)(b). Based on the August 26 hearing, the Government understands the Court did not anticipate additional evidence at the next hearing on forfeiture. (4/26/21 Tr. at 81:7-10.) To the extent the Court requires additional foundation on the exhibits' relevance and reliability, the Government is happy to comply. *See also* Fed. R. Evid. 1101(d)(3) (FRE not apply to "sentencing"); *United States v. Smith*, 770 F.3d 628, 640–41 (7th Cir. 2014) ("The Supreme Court has held that criminal forfeiture is 'an element of the sentence imposed following conviction or[ ] ... a plea of guilty.' … The Federal Rules of Evidence are inapplicable at sentencing.") (citations omitted).

[5] Hanes owns L'Eggs. *See* Hanes 2020 Form 10-K at 4 *available at* https://ir.hanesbrands.com/static-files/b5d984dd-eaf2-44b6-9487-d44d1b37ed80 (last visited Sept. 27, 2021). ACCO owns Mead. *See* ACCO Our Brands, *available at* https://www.accobrands.com/brands/ (last visited Sept. 27, 2021). "Hanes" and "ACCO" appear in Trial Exhibits 1A and 1AA. The Court may judicially notice information available on publicly accessible websites. *Herman v. SeaWorld Parks & Entm't, Inc.*, 2016 U.S. Dist. LEXIS 181173, *19 n.1 (M.D. Fla. Aug. 26, 2016) (judicially noticing website, and citing case).

[6] During the conspiracy period, Armor All and STP were owned by "Armored Autogroup" (as of 2010), and later "Spectrum Brands" as of 2015. *See* ArmorAll About Us *available at* https://www.armorall.com/about-us/history (last visited Sept. 27, 2021). Both "Armored" and "Spectrum" appear in Exhibits 1A and 1AA.

4

Fourth, the attached exhibits confirm the several companies that Mr. Ricupero determined, through open-source research, were the types of sellers that fit the conspiracy. (Ricupero Decl. ¶ 20; Ricupero Decl. II ¶ 4 (providing additional detail) *attached* as FEx. 23).) The exhibits show:

- Metro Whole Grocers purchased Bertolli products from Grobman (FEx. 8);

- Gemstar Inc. purchased a variety of products from Grobman, including from Yardley, Natrol, Agadir, Vander, and Curls (FEx. 9[7]);

- Joya Industries purchased No-Ad and Diamond from Grobman (FEx. 11);

- M&M Marketing purchased Atkins products, also listed in Trial Exhibits 1A and 1AA, from Grobman (FEx. 12), as well as Libman products, which Tropical distributed (FEx. 13 (email between Tropical and Libman re: diversion); FEx. 14 at 3-4 (Tropical list of products));

- Trade Link Capital purchased Atkins and Quaker products, both listed in Trial Exhibits 1A and 1AA, from Grobman, among other products. (FEx. 15); and

- Volume Inc. purchased Rice-A-Roni and Goya products from Grobman (FEx. 16). Rice-A-Roni is a Quaker-brand product. (FEx. 17).

**B.     Defendants selectively reference the trial record, disregarding the ample evidence of Alecorp and Tannco's involvement in the fraud conspiracy.**

To the extent that they reference the trial record, Defendants misstate the evidence presented. For example, they assert that "[a]s to Alecorp, another entity referred to in the Ricupero affidavit, the government never asserted at trial, much less alleged in the indictment, that any Alecorp sales were part of the charged fraud…. Torres made no statement attributing to Alecorp involvement in any type of fraud, much less the charged fraud; and no other witness discussed Alecorp or its sales at all." (Op. at 4-5). But the evidence admitted at trial showed that Grobman's

---

[7] Emails produced in discovery show Tropical was defrauding those companies. (*E.g.*, FEx. 10 (correspondence and purchase orders, including that Tropical was working on its next "Govt order" and requesting discount).) As the Court will recall from trial, one of Tropical's core lies was that Tropical had government contracts through the fake "Suriname Tender Office."

5

brother, Alan Grobman, and Alan's company, Alecorp, were neck-deep in the fraud conspiracy.[8] Alan personally was involved with the fictional Suriname Tender Office—in updating its website, and in renting a physical office for the fictional entity. (*See* TExs. 1STO-J, 1STO-K, 1STO-KK, 1STO-L). He also helped craft the phony Suriname Tender Office's "INVITATION FOR QUOTATION" for medical supplies. (TEx. 1STO-J.) The subject of the email in Trial Exhibit 1STO-J is "Re: comments BD"—a victim who manufactures medical supplies. (*Id.*;[9] *accord* FExs. 19 (Alan advising Nabi and Doekhie on negotiations with BD), 20 (Alan discussing BD's request for document with official government seals with Nabi and Doekhie).)

The trial evidence also showed that Alan was copied on the email in which Nabi directed Torres to produce false bills of lading at a faster pace. (*See, e.g.*, TEx. 1GM-G; Jan. 29 Tr. at 1887:18-1893:20 (Torres testifying that in TEx. 1GM-G, Nabi was asking for "false" bills of lading and Automated Export System forms, and that Alan at Alecorp was involved with "third-party logistics" and would "sell products."); *accord* FEx. 18 (Alan advising Nabi how to ship product).) As noted in the Motion, Grobman used Alecorp as an intermediary. (*See* Mot. at 7 (citing TEx. 8A).) In Trial Exhibit 8A, Grobman corresponded with someone at QMed Corp. about selling "Institutional"-marked Alcon products, which Grobman said he could "probably clean [] with acetone." Then, when it came time to invoice QMed, Grobman asked Alan at Alecorp to invoice QMed. *Id.* And Alecorp purchased product from Grobman. For example, the discovery documents

---

[8] Probation identifies Alan Grobman as a "co-conspirator." (Grobman PSI ¶ 28, ECF No. 553 ("One co-conspirator who helped with the creation of documents about the Suriname Tender Office that were provided to the victim companies and who was involved in the website was Grobman's brother, Alan Grobman.").)

[9] Torres testified that Alan Grobman, like his brother, was in the business of selling products intended for Tropical/Suriname, particularly medical supplies manufactured by victim BD. (Jan. 29 Tr. at 1892-93.) As Torres explained, "Some cargo would go through J Trading and some cargo would go through ALECORP, which is Alan Grobman's company." (*Id.* at 1893.)

showed Alecorp purchased Just for Men and Vagisil from Grobman, both of which are owned by Combe, which appears in Trial Exhibits 1A and 1AA.[10] (*See* FEx. 21 (Excel sheets produced natively at Bates numbers SWE-01778473 and SWE-01798129).)

With Tannco, Defendants concede that the distributor was part of the fraud conspiracy, but claim that it accounts for only $15,127,488.88 in proceeds for Grobman. However, the trial record establishes that from October 2014 through June 2018, Tannco paid an *additional* $44,838,367.12 into Nutrisource Bank of America account x0268, with $36,307,633.18 then flowing to Tropical. (TEx. 12B-3.) This undercuts Defendants' argument that only "$15,127,488.88 in Tannco proceeds" should be imposed as a forfeiture judgment." (Op. at 10.) Grobman instead obtained $59,965,856 in proceeds from Tannco alone. What's more, Trial Exhibit 12B-3 shows that additional money was deposited into Nutrisource account x0268, including approximately $700,000 from Brothers Trading. (Feb. 3 Tr. at 2636:4-2636:25.) That additional money also constitutes additional proceeds obtained by Grobman from the wire-fraud conspiracy, and additional proceeds obtained by Doekhie and Nabi from Grobman. However, these sums were not included in the Government's requested forfeiture money judgment amounts, underscoring what the Government has said from the outset—it made a conservative calculation based on transfers from distributors to J Trading, and transfers from J Trading to Tropical. *United States v. Feng Li*, 630 F. App'x 29, 35 (2d Cir. 2015) (when fashioning forfeiture amount, the Court "is permitted to use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding."); *accord United States v. Vico*, 2016

---

[10] *See* Combe Our Brands, *available at* https://www.combe.com/our-brands (last visited Sept. 27, 2021).

WL 233407, at *7 (S.D. Fla. Jan. 20, 2016) (money judgment does not require mathematical precision; Court may make reasonable extrapolations).

### C. Defendants' arguments on distributors are irrelevant to Doekhie and Nabi.

In the Opposition, Defendants also do not dispute that Doekhie and Nabi received (at least) $115,699,273.61 from Grobman. This amount sought for forfeiture equals proceeds that Doekhie and Nabi obtained in return for selling fraudulently obtained products to Grobman. (Mot. at 16-17.) That amount, again, is based on direct transfers—a straight line between Grobman and Tropical—and is not dependent on the sources of Grobman's money. Accordingly, Defendants' arguments vis-à-vis distributors are immaterial to the calculation of Doekhie and Nabi's forfeiture money judgment. Just like the Court does not look to where distributors like Quality King or Brothers Trading got their money to pay for product, there is no need to look for where Grobman obtained the money he used to pay Doekhie and Nabi. Their forfeiture money judgment amount is the gross proceeds they obtained from Grobman for their participation in the fraud conspiracy.[11]

### D. Defendants expand the scope of the Court's Rule 29 ruling to distort the trial record to fit their narrative.

Defendants spend much of their Opposition expanding the scope of the Court's Rule 29 ruling on Count 11, which charged money laundering, to discount their multiple fraud convictions in Counts 1-9. (Op. at 6-7.) They contend that only "slight evidence" was needed to overcome

---

[11] The Court also can impose the full money judgment amount against all Defendants, since they jointly were leaders and "masterminds" of the conspiracy and thus obtained all conspiracy proceeds. *See Honeycutt v. United States*, 137 S. Ct. 1626, 1633 (2017) (conspiracy mastermind "obtains" property he or she receives "directly," as well as "indirectly" through intermediaries); *United States v. Elbeblawy*, 839 F. App'x 398, 400 (11th Cir. 2021) ("Since *Honeycutt*, we have held that conspiracy leaders or 'masterminds' who control criminal enterprises jointly acquire the proceeds of the conspiracy with their co-conspirators.").

Rule 29, ignoring how a judgment of acquittal is a determination that "evidence is insufficient to sustain a conviction" beyond a reasonable doubt. *Compare id. with* Fed. R. Crim. P. 29(a).

As noted by Defendants, forfeiture determinations are based on a preponderance of the evidence. (Op. at 5.) Forfeiture amounts are calculated based on all amounts a defendant obtained through conspiracy, including amounts derived from uncharged substantive conduct, or substantive counts for which defendant was acquitted. *See United States v. Hasson*, 333 F.3d 1264, 1279 & n.19 (11th Cir. 2003) (involving a conspiracy to launder fraud proceeds); *United States v. Holland*, 722 F. App'x 919, 928 (11th Cir. 2018) ("The district court did not err by ordering [defendant] to forfeit funds linked to uncharged conduct."). In a conspiracy or scheme to defraud, as is the case here, "the proceeds of uncharged or acquitted conduct may become forfeitable because the government may be able to prove that money 'involved in the uncharged or acquitted [conduct] nevertheless constituted the proceeds of, or was traceable to, or was involved in, the [conspiracy or scheme to defraud] crime of conviction.'" *United States v. Kahale*, 2010 WL 3851987, at *30 (E.D.N.Y. Sept. 27, 2010), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012).

Here, the jury convicted Defendants on conspiracy to commit wire fraud in Count 1, and substantive wire fraud in Counts 2-9. As discussed above and in the Motion, there is ample evidence, more than a preponderance, that demonstrates that Grobman sold fraudulently obtained goods to, among others, Tannco, Alecorp, Quality King, L&V Distributors, Purity AP, Brothers Trading, Sultanta, MQ Wholesale, Metro Whole Grocers, Gemstar, Joya, M&M, Trade Link Capital, and Volume. Based on a review of financial records, Grobman's gross proceeds from the fraudulently obtained goods totaled $87,187,374.83 through J Trading alone. (Ricupero Decl.

¶¶ 15-21, 25-26.) According to these records, Doekhie and Nabi received payments from Grobman (and J Trading) that totaled at least $115,699,273.61. (*Id.* ¶¶ 25-26.)

In their Opposition, Defendants seemingly urge the Court to ignore their convictions, and grant Rule 29 with respect to the wire fraud conspiracy in Count 1 and the fraudulent scheme alleged in Counts 2-9. They appear to contend that the Rule 29 ruling on Count 11 precluded the jury and now precludes the Court from considering evidence presented that was relevant both to the money laundering and fraud counts. They argue that the Court determined, and allege that the Government conceded, that there was an "absence of evidence linking the companies now cited by the government to the charged conspiracy." (Op. at 6; *id* at 3-4, 5.) In support, Defendants quote defense arguments made by Ms. Arango at trial, that "[t]here's nothing here to in any way tie this into a conspiracy." (Op. at 3 (quoting Feb. 4 Tr. at 3049:4-5.[12]) These arguments are incorrect.

As previously noted, the Court is free to consider any evidence that is relevant and reliable in its forfeiture determination. (*See supra* at 3.) Furthermore, at no point did the Court hold any of the distributors identified in evidence presented in support of Count 11 were not part of the fraud conspiracy in Count 1. Indeed, the Court expressly acknowledged that for at least one distributor identified as relevant to the transaction set forth in Count 11—Frisone (L&V Distributors)—there was "plenty of evidence" that it purchased fraudulently obtained Goya products. The Court stated: "I disagree with Ms. Arango. There's plenty of evidence that Goya was being defrauded, plenty of evidence that Frisone was the buyer, plenty of evidence that Ms. Nabi and Mr. Grobman were part

---

[12] At the hearing, defense counsel again referenced this argument, stating: "Ms. Arango points out that there wasn't anything even in the discovery about these companies. Not even in the discovery, much less at trial." (8/26/21 Tr. at 59.) This is false. There were *thousands* of emails and attachments produced in discovery about these companies. A handful are included with this reply.

of it together." (Feb. 4 Tr. at 3050:15-18.)[13] The Opposition also quotes the Court out of context when it asserts, "[a]s this Court explained with regard to the L&V allegations, the government's argument as to L&V is 'too much of a stretch.'" (Op. at 3.) As already noted, there was "plenty of evidence" on L&V Distributors, and the "stretch" was only as to whether the Government had shown enough for the transaction in Trial Exhibit 11AA. (Feb. 4 Tr. at 3054:22-3055:3.)[14]

### E. Defendants should forfeit gross proceeds, and their Eighth Amendment argument is without merit.

The Government seeks to forfeit based on gross-proceeds amounts, which Defendants call an unfounded request. (Op. at 7-9.) In arguing against the application of gross proceeds, Defendants again mischaracterize the fraud as "selling lawful products in a lawful market" and making "lawful sales." (*Id.* at 8.) It was not; Defendants defrauded in obtaining (not selling) the products. As established at trial and laid out in detail in the Motion, to obtain the products, Defendants lied to 50-60 companies, created a fake government entity to do so, generated fake bills of lading and customs forms, broke into shipping containers, and more. (Mot. at 4-9.) That was the conduct for which they were convicted.

Indeed, in the time since the Government filed its Motion, another court agreed that gross proceeds are the proper measure for forfeiture in a similar wire-fraud scheme. *United States v.*

---

[13] Rather, the question at issue during the Rule 29 hearing was whether the money laundering transactions listed in in Count 11 were tied to fraudulently obtained products. (*Id.* at 3050:19-23.) And the Court thought for that *specific transaction* in 11AA, the proof was too attenuated. (*Id.* at 3054:22-3055:3.)

[14] Defendants also allege that the trial prosecutor made a "concession" during trial, taking his statement that he was "not aware of any evidence that we have as to the other three [distributors]"—MQ Wholesale, Brothers Trading, and Quality King, to mean that no evidence exists tying them to the fraud. The trial prosecutor was referring to the evidence already introduced at trial to support just one money laundering count; he stated the Government elected to shorten trial and not put on evidence of each and every distributor. (Feb. 4 Tr. at 3052:18-20.) But as shown above, the trial record and discovery establish all distributors involved in Count 11 (among others) purchased diverted products from Grobman.

*Davis*, 2021 WL 3912868, at *4 (N.D. Tex. Sept. 1, 2021). The defendant in *Davis*, who was convicted of wire fraud after lying to the Government to receive GI Bill benefits, argued that because he was running a trade school, his forfeiture should be calculated with net proceeds because his school "was a lawful service provided in an illegal manner …." *Id.* at *4. The court disagreed: "the fraudulent scheme charged by the Government was not for the illegal provision of trade school services but rather for the unlawful receipt of government funds. Davis could not have lied to government entities or fraudulently received GI Bill benefits in a hypothetically lawful manner, therefore his wire fraud offenses were inherently unlawful and subject to section 981(a)(2)(A)." *Id.* The same is true here. Defendants were convicted of fraudulently obtaining their products in a wire fraud scheme and conspiracy. They could not have lied to the manufacturers or *fraudulently* obtained products in a hypothetically lawful manner.

Defendants also reference the Government's reply filed on January 10, 2020 in *United States v. Javat* (S.D. Fla. 18-CR-20688-DMM), in which the Government responded to that defendant's arguments and stated that a net proceeds calculation would not violate the Eighth Amendment. *Mincey*, a case explained in detail in support of the Motion (Mot. at 11-13), was decided by the Eleventh Circuit shortly thereafter, on January 22, 2020. *Javat* presents a distinct case, decided pre-*Mincey*. Finally, despite their insistence on a net-proceeds calculation, Defendants have not offered evidence to meet their burden of showing "direct costs incurred" to reduce the proposed forfeiture amounts, making this dispute largely academic. *See* 18 U.S.C. § 981(a)(2)(B).[15] Without any evidence, the Court cannot reduce the proposed forfeiture amounts.

---

[15] Grobman's payments to Tropical have already been carved out by the Government for other reasons. At the forfeiture hearing but not in the Opposition, Grobman's counsel referenced deducting amounts paid to Torres. (8/26/21 Tr. at 26.) Those amounts, however, are not subject to netting out because Torres was an essential component of the fraud. *United States v. Butler*, 578

Defendants instead point to Grobman paying taxes as a basis to lessen forfeiture on Eighth Amendment grounds (and not based on "net proceeds" calculation under 18 U.S.C. § 981(a)(2)(B)). (Op. at 9-10.) They argue that forfeiting criminal proceeds can violate the Eighth Amendment.[16] Notably, they do not cite a single case where a court held forfeiting proceeds violated that Amendment. As set forth in the Motion, forcing defendants to part with the fruits of their criminal activity cannot be grossly disproportionate to the offense. (Mot. at 19-20.) *See also Davis*, 2021 WL 3912868, at *7 (forfeiting gross proceeds not disproportionate).

### F. Defendants' objection to direct-forfeiture tracing relies on a faulty premise.

In their Opposition, Defendants refer to an alternative "tracing analysis" that disputes Mr. Ricupero's analysis regarding directly forfeitable property, but do not provide additional detail. Without more, the Government can only guess that Defendants' "tracing analysis" of the direct forfeiture presumably relies on their contention that only Tannco proceeds count. (*See* Op. at 11-12.) As set forth above, that premise is wrong. Thus, Defendants' "analysis," relying on when Tannco receipts entered accounts, cannot be the basis to disturb the Government's analysis. Defendants further fail to acknowledge that not only amounts restrained in accounts at the time of

---

F. App'x 178, 183 (4th Cir. 2014) ("Butler was not entitled to a credit for any value of his labor, which was an essential component of the fraud scheme.").

[16] In the midst of their Eight Amendment arguments, Defendants write, "The Defendants renew their prior contentions, including those that the Court has already overruled, including Defendants' objection that the forfeiture proceedings were not timely initiated by the government." (Op. at 10.) The Government is unsure what Defendants refer to (other than timing), and thus is hard-pressed to respond specifically. To the extent the Court accepts such a broad "renewal," the Government opposes for the same reasons previously and incorporates any such arguments. As to the timing of the Government's initial motion—Rule 32.2 of the Federal Rules of Criminal Procedure speaks to when orders are to be entered, not when motions are to be filed. In any event, it is inconceivable that a motion filed five months before a then-scheduled sentencing is untimely, especially when, in non-pandemic times, there often is less than five months total between verdict and sentencing. And as we sit here today, sentencing is not scheduled six-months after filing.

the protective order are subject to forfeiture, but so is any appreciation in their value. *Davis*, 2021 WL 3912868, at *9 n.42.

To the extent Defendants otherwise challenge the specifics of Mr. Ricupero's tracing, those challenges are better addressed at a hearing where Defendants can present their alternative analysis, and where Mr. Ricupero can explain his methodology.

        Respectfully submitted,

        JUAN ANTONIO GONZALEZ
        ACTING UNITED STATES ATTORNEY

By:   */s/Joshua Paster*
       JOSHUA PASTER
       Court ID No. A5502616
       Telephone: (305) 961-9342
       Joshua.Paster@usdoj.gov
       Telephone: (305) 961-9338
       joshua.paster@usdoj.gov
       Assistant United States Attorney
       99 N.E. 4th Street, 7TH Floor
       Miami, Florida 33132-2111